J-S37014-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: N.S. | : | |
| | : | |
| | : | No. 945 EDA 2024 |

Appeal from the Dispositional Order Entered February 14, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-JV-0000252-2021

BEFORE: BOWES, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.: **FILED DECEMBER 30, 2024**

N.S. appeals from the order entered on February 14, 2024, following a dispositional review hearing for his 2021 adjudication of delinquency. We affirm.

In February 2020, Appellant, then aged fifteen, repeatedly stabbed his thirteen- and nine-year-old siblings at a playground, causing them significant injuries. The Commonwealth initially charged him as an adult with attempted homicide, aggravated assault, and other crimes, but the trial court decertified the matter to juvenile court upon Appellant's unopposed request. At the July 19, 2021 adjudication hearing, Appellant entered admissions to acts that, if committed by an adult, would constitute two counts of aggravated assault and one count of possessing an instrument of crime, conceding that he used a knife from the family home to repeatedly stab his brother in the face, chest, and hands, causing a collapsed lung, and then to stab his sister in the head multiple times.

Subsequent court-ordered psychiatric and psychological evaluations revealed diagnoses of psychotic disorder and early-onset schizophrenia, with visual, auditory, olfactory, and tactile hallucinations and recommended that Appellant be placed in a residential treatment facility until therapists concluded he was ready to be reunified with his family. At a September 29, 2021 dispositional hearing, the Commonwealth provided expert testimony that Appellant suffered from psychosis of an unclear nature, likely a schizoaffective disorder or a combination of schizophrenia and an affective illness, making him extremely dangerous until his condition was brought under control through treatment. On this basis, the court ordered Appellant to be placed at the Harborcreek Youth Services ("HYS") residential treatment facility pending future review.

The juvenile court thereafter held dispositional review hearings at three-month intervals, which it detailed as follows:

> The Honorable Garrett D. Page presided over a dispositional review hearing on March 28, 2022. The court had the benefit of a report from HYS, Erin Bastow, MS, LPC, NCC—Clinical Director, which assessed Appellant's behavior from initial intake, October 4, 2021, to March 8, 2022. The report discussed progress Appellant had made through therapy but recommended that "continued placement in a structured psychiatric residential program continues to be necessary" and that Appellant continues to need "psychiatric consultation and medication management" along with "individual counseling and therapy" and other services. The court ordered that Appellant remain at HYS.
>
> Of note, a Horsham Clinic psychiatric evaluation provide[d] that in February 2022, Appellant was experiencing "auditory and visual hallucinations, derogatory in type including visual hallucinations of monsters talking to him." During this time period

- 2 -

Appellant "became increasingly paranoid, believed the government was going to arrest his family and he started to have auditory hallucinations, command type to kill people."

HYS presented another report, purportedly reviewed by [Clinical Director Bastow], for the period from March 8, 2022 to June 13, 2022. This report concluded that Appellant had made "significant progress" and was headed for a "possible discharge" but that he would benefit from the following services upon release: "psychiatric consultation and medication management, independent living services and family-based mental health services."

Following another dispositional review hearing on June 27, 2022, Judge Page discharged Appellant effective June 30, 2022 and placed him on probation supervision with various conditions.

While on probation, Appellant's family admitted Appellant to the Horsham Clinic on or about October 9, 2022. According to the Horsham discharge plan dated October 19, 2022, the "reason for admission" was "recurrent intrusive thoughts of hurting people, raping women." The discharge diagnosis was schizoaffective disorder.

Appellant remained on probation through a December 22, 2022 dispositional review hearing. The next dispositional review hearing took place on March 10, 2023. The March 10, 2023 dispositional review — probation supervision report noted the following:

- Since the December 22, 2022 hearing Appellant's "behavior appears to be decompensating."

- Appellant began attending the Explorations partial hospitalization program (PHP) ("Explorations") on January 11, 2023 "to continue his education in an atmosphere that dealt with children who have psychiatric issues or disorders."

- At Explorations, Appellant spoke about talking to the "Sandman" and "wonders aloud in school questioning why he has a lack of care of others, and feels nothing when someone gets hurt."

- On February 1, 2023 he "revealed that his younger siblings had friends over and he had thoughts of harming them."

- On February 15, 2023, Appellant's mother found a box cutter in Appellant's book bag. Appellant's parents apparently told the school that Appellant "raises his voice, curses, and threatens his father by posturing."

- On February 17, 2023, Appellant's mother contacted Explorations expressing fear for her family. That day, Mother transported Appellant to Belmont Behavioral Hospital where he remained until his discharge on February 24, 2023.

- Upon returning to Explorations, Appellant was involved in a conflict with another student, punched a wall, accused his peers of having a vendetta against him and was overheard by staff saying "he just came from lock up and killed four people."

- Appellant admitted to Explorations staff that he had thoughts of harming his father prior to being admitted to Belmont Behavioral Hospital.

- At a "team meeting" on March 3, 2023, Appellant's mother spoke of Appellant's "fantasies of harming people" and an incident where Appellant "revealed that he saw people in the park and thoughts of harming them."

- The March 7, 2023 progress note from Explorations provides that Appellant reports "urges and thoughts to hurt others" which is like a "feeling of being hungry" and th[at] "he wants to do this so badly." Appellant reported having dreams of going on a "killing spree" which he describes as giving him a rush and that he did not want to wake up from those dreams.

At the conclusion of the March 10, 2023 Dispositional Review Hearing, Judge Page ordered that Appellant be detained at the [Montgomery County Youth Center ("MCYC")] pending psychological and psychiatric evaluations.

Appellant remained at MCYC until May 12, 2023 when he was released to the Horsham Clinic. Appellant was admitted to

Horsham with "worsening symptoms of psychosis" and "auditory hallucinations" that were "consistent" and "overwhelming" and involved voices "talking to themselves." At the time of admission, Appellant "expressed having homicidal ideations and continued to struggle with auditory and visual hallucinations." Appellant had "intrusive homicidal thoughts, but stated that he would not act on them." Appellant "described a long history of psychosis and having thoughts of hurting others, which he stated he could ignore."

Appellant treated at the Horsham Clinic from May 12, 2023 until he was discharged on December 12, 2023 for violating rules of the program. While at the Horsham Clinic, Appellant made some progress in treatment and reported that the voices were "making commentary and were no longer command type." Appellant's symptoms of psychosis "gradually started to improve within the safety and structure of the inpatient unit and with medication adjustments." Appellant became psychiatrically stable as a result of "various modalities of treatment, medication adjustment and therapeutic adjustments."

However[,] Appellant committed acts of violence at the Horsham Clinic, including three incidents of assaultive behavior involving a "peer" or "patient." In October of 2023, Appellant "was reported to have assaulted a transgender patient resulting in a harassment citation." Additionally, on October 30, 2023, the Horsham Clinic "reported that [Appellant] made several residents and staff afraid, making claims that he could commit a Halloween massacre,' `terrorize the unit,'" and several other alarming statements.

Appellant was ultimately discharged from the Horsham Clinic, effective December 22, 2023, after he "physically attacked a patient in the cafeteria." Specifically, on December 14, 2023, Appellant "struck an intellectually disabled resident multiple times with a closed fist, unprovoked."

On December 22, 2023, following Appellant's discharge from the Horsham Clinic and a dispositional review hearing, the Honorable Joseph A. Smyth ordered that Appellant be held at the MCYC pending further court proceedings. Appellant remained at the MCYC following dispositional review hearings on January 22, 2024 and February 8, 2024.

>     While at the MCYC, Appellant continued to act out violently. On or about December 26, 2023, Appellant "engaged in an unprovoked physical aggression against a resident of smaller stature who was having a disagreement with another resident." On January 20, 2024, Appellant reportedly was accused of "striking and charging at a younger resident before being physically restrained."

Juvenile Court Opinion, 5/13/24, at 6-11 (cleaned up).[1]

The dispositional order *sub judice* followed a February 14, 2024 review hearing before the Honorable Henry S. Hilles, III. Among the evidence considered were evaluations that the court summarized as follows:

- **September 28, 2023 Psychological Re-Evaluation Risk Assessment by Jessica A. Port, Psy.D. (Hugh S. Smith Ph.D. & Associates) (requested by the Court)**. Dr. Port noted that "there continues to be several factors that increase his risk, both for himself and others, and would need to be addressed prior to discharge to the community." These factors "include the intensity of his previous charges, the severity of his mental health symptoms, suspected poor peer relations, limited insight, and increased safety risk." Dr. Port noted Appellant's "pattern of cruelty to animals" and "variable expressed empathy" in concluding that Appellant has "potential development of antisocial tendencies" and presents with "individual/clinical risk factors in the high range." Dr. Port recommended "longer-term residential programming" that

---

[1] Although the notes of testimony from the original 2021 dispositional hearing are included in the certified record before us, no transcript for any subsequent review hearing was certified in the record transmitted to this Court despite Appellant's transcript request filed on March 12, 2024. This Court *sua sponte* obtained the transcript from the February 14, 2024 review hearing at issue in this appeal through an informal inquiry of the juvenile court. *See* ***Commonwealth v. Preston***, 904 A.2d 1, 8 (Pa.Super. 2006) (explaining that this Court may informally request transcripts that have been requested and prepared but erroneously omitted from the certified record). The prior review hearings are not implicated by Appellant's challenges such that their absence from the certified record does not hamper our review.

"would address his mental health symptoms on a long-term basis with the goal of future reintegration into the community."

- **October 10, 2023 Psychological Evaluation by Gillian Blair, Ph.D., LL.M. (The Bridge) (requested by defense counsel)**. Dr. Blair noted that "while Appellant is remorseful for harming his brother and sister, he stops short of extending similar sentiments to those he has no relationship with. He also admits to intense feelings of anger. These will need to be addressed in therapy, which is likely to be an arduous process." Dr. Blair further noted that "there are few programs available to meet Appellant's needs." Dr. Blair opined that the then-pending plan that Appellant "transition to Horsham's Partial Program appears viable" with psychological and psychiatric care in place prior to being "transferred to the RTF-A" (i.e., an RTF for adults). Dr. Blair further opined that "step down and return to the community will need to be carefully planned to maximize a successful reintegration."

- **November 13, 2023 Psychiatric Evaluation by Darren Piechota, M.D. (BH —The Horsham Clinic**). Dr. P[ie]chota noted Appellant's "long-term needs" involving "appropriate mental health treatment to monitor his symptoms, which have in the past included auditory and visual hallucinations and expressing thoughts of harming others." Dr. Piechota recommended that Appellant "be placed in a residential treatment facility for adults (RTF-A)." Dr. Piechota also authored a December 21, 2023 letter recommending that Appellant be "discharged 12/22/23 to detention to await a long-term placement."

- **January 25, 2024 Psychiatric Evaluation by Rossana Avelino, M.D. (Child Guidance Resource Centers, Inc.)**. Dr. Avelino noted that Appellant has a history of psychosis. Dr. Avelino provided that Appellant reports he is feeling better but "Appellant omitted to mention that since he has been back in the Detention Center, he has assaulted two kids. One of them was [twelve] years old, and apparently the episodes were unprovoked." With respect to these assaults, Dr. Avelino noted that "Appellant also talked about not feeling one hundred percent remorseful about what he did. He said that part of him feels sorry and ashamed, but another part of him has no real feelings about it." Dr. Avelino opined that Appellant "needs a forensic psychiatric evaluation to determine what would be the

- 7 -

best placement and course of treatment. I cannot make that determination."

*Id*. at 11-13 (cleaned up).

As the Probation Department indicated in its report, all the evaluations of Appellant had one thing in common: "None of them recommend[ed] his return to the community at th[at] time." *Id*. at 13 (cleaned up). The juvenile court agreed, concluding that "Appellant's history of violent behavior," which "continued at the MCYC in the weeks leading up to" the hearing, along with his "psychotic thoughts and homicidal ideation[,] are deeply troubling and represent a clear and present threat to the community." *Id*. Therefore, the question "became whether there was [a] placement facility that was less restrictive than a state secure facility." *Id*.

The Commonwealth proffered evidence that the Probation Department had made referrals to more than sixty different programs for less-restrictive placement, but all responses were denials and the one that did not respond had denied Appellant previously. *Id*. at 14. With no other alternatives that were both appropriate and available, Probation Supervisor Carol M. Seals recommended that the court place Appellant in a state secure facility, in particular the North Central Secure Treatment Unit in Danville, Pennsylvania ("North Central"). *Id*. There, Appellant would receive weekly treatment and therapy in a "special mental health unit where they put their extreme cases for mental health[.]" *Id*. (cleaned up).

Appellant proposed two different options. One, found through "scouring the country for any services," was for him to remain in the MCYC and receive treatments there three times per week with Dr. Bridget Brush of the Center for Anxiety, OCD, and Cognitive Behavioral Therapy.[2] Another was to release Appellant to the care of his maternal grandparents, who testified that they were willing to secure private therapy for him. **See** N.T. Hearing, 2/14/24, at 17-21, 32-34.

Unpersuaded, the juvenile court ordered Appellant's placement at North Central, with treatment to continue at MCYC pending the transfer. Appellant filed a timely notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). He presents the following question for our consideration: "Did the [juvenile] court err in committing [Appellant] to [North Central] when the court failed to consider the least restrictive alternatives available and give balanced attention to development of competency that would enable the juvenile to rehabilitate himself?" Appellant's brief at 5.

We begin with the applicable legal principles. "Our standard of review of dispositional orders in juvenile proceedings is well settled. The Juvenile Act grants broad discretion to juvenile courts when determining an appropriate

---

[2] Appellant indicated that Dr. Brush was willing to go into MCYC five times each week to treat N.S., but the center was only able to accommodate three sessions per week. **See** N.T. Hearing, 2/14/24, at 16-17.

disposition. We will not disturb the juvenile court's disposition absent a manifest abuse of discretion." *Interest of N.M.*, 311 A.3d 1149, 1152 (Pa.Super. 2024) (cleaned up). As we have explained in other contexts: "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Interest of D.J.K.*, 303 A.3d 499, 504 (Pa.Super. 2023) (cleaned up).

The stated purposes of the Juvenile Act ("the Act") relevant herein are as follows:

(1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.

(1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter.

(2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety, by doing all of the following:

(i) employing evidence-based practices whenever possible and, in the case of a delinquent child, by using the least restrictive intervention that is consistent with the protection of the

community, the imposition of accountability for offenses committed and the rehabilitation, supervision and treatment needs of the child; and

(ii) imposing confinement only if necessary and for the minimum amount of time that is consistent with the purposes under paragraphs (1), (1.1) and (2).

42 Pa.C.S. § 6301(b).

When a court has found a child to be delinquent, his disposition is governed by § 6352 of the Act, which provides in pertinent part:

**(a) General rule.--**If the child is found to be a delinquent child the court may make any of the following orders of disposition determined to be consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community:

(1) Any order authorized by [§] 6351 (relating to disposition of dependent child).[3]

(2) Placing the child on probation under supervision of the probation officer of the court or the court of another state as provided in [§] 6363 (relating to ordering foreign supervision), under conditions and limitations the court prescribes.

(3) Committing the child to an institution, youth development center, camp, or other facility for delinquent children operated under the direction or supervision of the court or other public authority and approved by the Department of Public Welfare.

_____

[3] The orders enumerated in that section of the Act include those that allow the child to remain with his family subject to limitations; temporarily transfer legal custody to another person, agency, or private organization; and transfer custody to the juvenile court of another state. *See* 42 Pa.C.S. § 6351(a).

(4) If the child is [twelve] years of age or older, committing the child to an institution operated by the Department of Public Welfare.

(5) Ordering payment by the child of reasonable amounts of money as fines, costs, fees or restitution as deemed appropriate as part of the plan of rehabilitation considering the nature of the acts committed and the earning capacity of the child, including a contribution to a restitution fund. . . .

(6) An order of the terms of probation may include an appropriate fine considering the nature of the act committed or restitution not in excess of actual damages caused by the child which shall be paid from the earnings of the child received through participation in a constructive program of service or education acceptable to the victim and the court[.] . . .

In selecting from the alternatives set forth in this section, the court shall follow the general principle that the disposition imposed should provide the means through which the provisions of this chapter are executed and enforced consistent with [§] 6301(b) (relating to purposes) and when confinement is necessary, the court shall impose the minimum amount of confinement that is consistent with the protection of the public and the rehabilitation needs of the child.

**(b) Limitation on place of commitment.--**A child shall not be committed or transferred to a penal institution or other facility used primarily for the execution of sentences of adults convicted of a crime.

**(c) Required statement of reasons.--**Prior to entering an order of disposition under subsection (a), the court shall state its disposition and the reasons for its disposition on the record in open court, together with the goals, terms and conditions of that disposition. If the child is to be committed to out-of-home placement, the court shall also state the name of the specific facility or type of facility to which the child will be committed and its findings and conclusions of law that formed the basis of its decision consistent with subsection (a) and [§] 6301, including the reasons why commitment to that facility or type of facility was determined to be the least restrictive placement that is consistent with the protection of the public and best suited to the child's treatment, supervision, rehabilitation and welfare.

J-S37014-24

42 Pa.C.S. § 6352.

In keeping with 42 Pa.C.S. § 6352(c), Pa.R.J.C.P. 512(D) requires the court to enter its findings and conclusions into the record and, when the juvenile is removed from the home, to state in open court "why the court found that the out-of-home placement ordered is the least restrictive type of placement that is consistent with the protection of the public and best suited to the juvenile's treatment, supervision, rehabilitation, and welfare[.]" Pa.R.J.C.P. 512(D)(4)(b). Once the juvenile court has ordered removal of the juvenile from the home for placement, it retains "considerable power to review and modify the commitment, taking into account the rehabilitative progress or lack of it of the juvenile." *Interest of A.R.A.*, 315 A.3d 877, 881–82 (Pa.Super. 2024) (cleaned up).

Mindful of the governing authority, we turn to Appellant's argument which is in its entirety as follows:

> In the instant case, all of [Appellant]'s psychiatric evaluations recommended placement in a residential treatment facility. However, because no residential treatment facilities were willing to accept [Appellant], the [juvenile] court instead opted for placement in the highly restrictive setting of the North Central[.] In doing so, the court eschewed two less restrictive options: (1) that [Appellant] remain at MCYC and receive treatment from Dr. Brush at least [three] days per week and (2) that [Appellant] be released to his maternal grandparents where he would receive private therapy.
>
> The [juvenile] court's February 14, 2024 disposition order contains no explanation as to why the court rejected these alternatives. Similarly, while the [juvenile] court's opinion explains why placement with [Appellant]'s grandparents was inappropriate due to his potential danger to the community at

- 13 -

large, it does not even mention [Appellant] receiving treatment by Dr. Brush at MCYC, let alone why that option was inappropriate. As a result, its decision to place [Appellant] in [North Central] was squarely at odds with the court's mandate under 42 Pa.C.S. § 6352(c) and Pa.R.J.C.P. 512 and therefore constitutes an abuse of discretion.[2]

_____

[2] Present counsel would note that he is aware of Pa.R.A.P. 2119(a)'s mandate to provide citations to authorities as are deemed pertinent. However, after a diligent search of the caselaw relating to challenges to out-of-home placement, counsel has been unable to find any cases in which a lower court has been deemed to have disregarded less restrictive alternatives in the manner of the lower court in the instant case. Thus, the clear language of 42 Pa.C.S. § 6352 and Pa.R.J.C.P. 512 appear to be the primary authorities in this matter.

Appellant's brief at 12 (cleaned up).

The juvenile court in its Rule 1925(a) opinion, invoking the above-referenced psychiatric and psychological evaluations, addressed Appellant's claim of error thusly:

At the conclusion of the hearing, the court detailed its reasons for out-of-home placement[,] including the multiple evaluations described [above] (none of which recommended that Appellant be immediately returned to the community)[,] along with the need for the court to protect the public. The court ultimately accepted the recommendation of the Juvenile Probation Department of placement at North Central[.]

As Ms. Seals provided in her on-the-record presentation, a less-restrictive placement facility was literally impossible. Referrals were made to numerous placement facilities in an effort to identify a placement facility that would be less restrictive than a state secure facility. None would accept Appellant because of his history of violent acts, homicidal ideations and significant therapeutic needs. Essentially, as argued persuasively by the Juvenile Probation Department and the Commonwealth, the court was left with two options: placement at a state secure facility and release to the community.

- 14 -

During the February 14, 2024 hearing, Appellant's mother and maternal grandmother argued, generally, that Appellant should be released to the care and custody of Appellant's grandparents. This, they argued, would ensure that Appellant's siblings would be safe. Maternal grandmother testified that she and maternal grandfather would supervise Appellant and ensure that he received appropriate therapy.

These arguments, however, ignore the reality that Appellant presents as a clear and present danger to the community at large, not simply to the younger siblings that he previously stabbed. As set forth in the evaluations, *infra*, [*sic*] Appellant had articulated homicidal ideations and made statements regarding a "killing spree" and a "Halloween massacre" which necessarily involves the threat to multiple persons. Moreover, Appellant's violent assaults on multiple people at the Horsham Clinic and the MCYC in the months prior to the February 14, 2024 hearing involved non-family members.

The court's conclusion that Appellant should be placed in an out-of-home facility was warranted and certainly no abuse of discretion. Releasing Appellant to his family would have been inappropriate and created a significant, unacceptable and foreseeable danger to the community.

With respect to placement facilities, the Juvenile Probation Department made numerous referrals over several years in an effort to find a less restrictive facility as opposed to a state secure facility. However[,] because of Appellant's violent acts and behaviors along with his extreme treatment needs, placement at any such facility proved futile. The court was left with the binary choice of release to the community or placement at a state secure facility. The decision was clear based on the totality of the evaluations and the circumstances: North Central was the least restrictive appropriate placement setting.

. . . North Central has the capability to provide weekly therapy on its "special mental health unit." The court directly addressed Appellant at the February 14, 2024 hearing, noting that

North Central is designed to help people. There are juveniles who have exited that facility with positive recommendations and have done well and I challenge you to be one of them. You will come back in front of

me within five months and I challenge you to do well. Get the evaluations you need. Get along with everyone. Make a good faith effort so that the report that I'm getting in five months is a positive one, and then we can start the process of considering where we are and what we can do for you. That's my challenge to you.[4]

The court's ultimate carefully-considered conclusion, balancing the [§] 6352 factors, was that . . . North Central presented as the least restrictive placement that is consistent with the protection of the public and best suited to Appellant's treatment, supervision, rehabilitation and welfare.

Juvenile Court Opinion, 5/13/24, at 16-18 (cleaned up).

Upon careful review, we discern no abuse of discretion on the part of the juvenile court. The certified record confirms that, consistent with §§ 6301(b) and 6352, the court thoughtfully and thoroughly considered the specific circumstances of this case, Appellant's rehabilitative needs, and the public's need for protection, and then ordered the least restrictive appropriate placement.[5] Since all mental health professionals agreed that returning Appellant to the community was inappropriate at this juncture, the trial court's decision not to place Appellant with his grandparents is reasonable and

_____

[4] To the extent that the dispositional order at issue in this appeal may have been mooted by a subsequent order, we note that our Supreme Court has deemed similar challenges to juvenile court orders to satisfy an exception to mootness doctrine. *See Interest of N.E.M.*, 311 A.3d 1088, 1094–95 (Pa. 2024).

[5] The court also stated this reasoning on the record at the conclusion of the hearing in compliance with Pa.R.J.C.P. 512(D). *See* N.T. Hearing, 2/14/24, at 59-64.

supported by the record. The evidence that Appellant continued to engage in violent behavior and harm other residents at MCYC supported the court's conclusion that Appellant placement there was not adequately serving his rehabilitative needs. Indeed, Appellant acknowledged as much at the hearing, stating that the plan with Dr. Brush "is not the answer, but the seventy places we asked to help us declined." N.T. Hearing, 2/14/24, at 19. Under these circumstances, it appears that North Central was the least restrictive placement that was available and appropriate.

Accordingly, Appellant has not demonstrated that the juvenile court's disposition order was "a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Interest of D.J.K.*, 303 A.3d at 504 (cleaned up). Consequently, we have no cause to disturb it. *Accord Interest of A.R.A.*, 315 A.3d at 884 (affirming placement of juvenile in secure state facility where less-restrictive supervision had been ineffective at preventing further delinquent acts or otherwise rehabilitating him).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/30/2024

- 17 -